IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
RAYMOND NORWOOD,              :
                             :
          Plaintiff,          :
                             :
     v.                       :     (HON. JEROME B. SIMANDLE)
                             :
MICHAEL J. ASTRUE,            :     CIVIL NO. 07-4658 (JBS)
COMMISSIONER OF               :
SOCIAL SECURITY               :        **OPINION**
ADMINISTRATION,               :
                             :
          Defendant.          :
```

APPEARANCES:

Robert A. Petruzzelli, Esq.
Jacobs, Schwalbe & Petruzzelli, PC
Woodcrest Pavilion
Ten Melrose Ave., Ste. 340
Cherry Hill, NJ 08003
     Attorney for Plaintiff

Christopher J. Christie
UNITED STATES ATTORNEY
     By:  Susan J. Reiss
          Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Suite 3904
New York, NY 10278
     Attorney for Defendant


**SIMANDLE**, District Judge:

     This matter comes before the Court pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. §

405(g), to review the final decision of the Commissioner of the

Social Security Administration ("the Commissioner") denying the

application of Claimant Raymond Norwood ("Claimant") for

disability insurance benefits under Title II  of the Social Security Act and for supplemental security income benefits under Title XVI of the Social Security Act.   <u>See</u> 42 U.S.C. §§ 401-34, 1381-83.  Claimant filed an application for disability insurance benefits and supplemental security income with a protective filing date of December 11, 2003, alleging his disability onset date as November 16, 2003, and claiming that he was unable to work due to irritable bowel syndrome and depression.  (R. at 67-69.)  Claimant urges this Court to reverse the decision of the Commissioner and order an award of benefits or, in the alternative, to remand his claim to the Commissioner for a proper determination of disability as required by statute.  The Commissioner requests an order affirming his decision on the record under the "substantial evidence" standard.

At issue in this case is whether there is substantial evidence in the record for the Administrative Law Judge's ("ALJ") determinations that Claimant was not disabled at any relevant time and that Claimant has the residual functional capacity for light, unskilled work.

The Court has considered the submissions of the parties pursuant to Local Civil Rule 9.1.  Because the ALJ properly followed the five-step sequential evaluation process and explained the basis for his decision as required by applicable federal regulations, the Court finds substantial evidence in the

record to support the ALJ's decision that Claimant has not been disabled throughout the relevant time period as defined under Titles II and XVI of the Social Security Act.  The Court further finds substantial evidence to the support the ALJ's determination of Claimant's Residual Functional capacity.

## I.   BACKGROUND

### A.   Procedural History

On December 11, 2003, Claimant Raymond Norwood filed an application for disability insurance benefits and supplemental security income benefits, alleging that he was disabled as a result of irritable bowel syndrome and depression.  (R. at 67-69, 260.)  The Social Security Administration denied his application initially on June 24, 2004. (Id. at 36-38.)  Claimant's application was denied on reconsideration on August 12, 2004. (Id. at 43-46.)  Claimant subsequently filed a timely Request for an Administrative Hearing on October 13, 2004. (Id. at 47.)  The initial hearing was held on November 10, 2005 before an Administrative Law Judge ("ALJ").  (Id. at 264-94.)  A supplemental hearing to consider additional evidence was held on February 16, 2006 before the same ALJ. (Id. at 295-309.)  The ALJ issued a decision on June 23, 2006, ruling that Claimant was not disabled.  (Id. at 23-31.)

Claimant requested review by the Appeals Council on July 10, 2006, (id. at 19-20), and the Appeals Council denied the request

for review on September 7, 2007. (Id. at 4-6.)  The ALJ's

decision therefore became the final decision of the Commissioner.

(Id.)

Having exhausted his administrative remedies, Mr. Norwood,

through his attorney, timely filed the present action with this

Court on September 28, 2007, seeking reversal of the

Commissioner's determination and an award of benefits, or in the

alternative, a remand for a new hearing.  The Commissioner

requests that the Court affirm his decision under the

"substantial evidence" standard.

**B.   Facts**

1.   Claimant's Testimony

Claimant testified at his Administrative Hearing on November

10, 2005 that he was six feet and two inches tall, and weighed

250 pounds.  (R. at 285.)  He testified that, while he had lived

alone for some time between 1988 and 2001, at the time of the

hearing he lived with his sister in Vineland, New Jersey.  (Id.

at 270, 275, 283.)

Regarding his education and work history, Claimant testified

that he graduated from high school in 1988 and has worked for

three companies since that time.  (Id. at 270.)  He testified that

he held two jobs in 1988, originally mopping floors for Apple

Farms and then stacking boxes from a railroad car for East Coast

Refrigeration.  (Id.)  Claimant then accepted employment at

Seabrook Brothers in 1989 and held three positions at that company until he was let go in November of 2003. (Id. at 270-71.)

Mr. Norwood testified that for four of the fourteen years that he spent at Seabrook Brothers he served as a line leader, in which position he supervised the operation of a frozen food bagging line. (Id. at 271-72.) In that capacity Claimant supervised line workers as well as the appearance and net weights of the bags of frozen vegetables that came off the line. (Id.)

Additionally Claimant testified that he spent some of his time while employed by Seabrook Brothers as a laborer. (Id. at 273.) For that position, Claimant had to break up 800-pound frozen blocks of vegetables with a metal pole and had to lift objects weighing between forty-five and fifty pounds. (Id.)

Claimant testified that he spent the remainder of his employment with Seabrook Brothers in quality control, checking the grades of individual beans as well as their weight and any damage to them. (Id. at 272.) Claimant testified that he suffered a knee injury in the course of his employment in 2003. (Id. at 274.)

According to Mr. Norwood's testimony, after he was cleared to return to work from his knee injury, Seabrook Brothers attempted to find him a job that he could perform even with his physical limitations. (Id. at 288.) According to Claimant,

5

these jobs included stacking boxes on a pallet, strapping wooden pieces to the sides of boxes and sealing them in place, and finally quality control as described above.  (Id. at 289-90.) Claimant testifed that the quality control job involved too much walking and required him to work at a distance too far from the bathroom.  (Id. at 291.)  He testified that he had a number of bathroom problems while performing this job.  (Id.)  Claimant indicated that these problems forced him to take leave from his employment under the Family Medical Leave Act from August until November of 2003.  (Id. at 291.)  In November 2003, Claimant testified, he was terminated when he did not return to his employment after his allowed leave time ran out.  (Id. at 291-92.)

Claimant testified as to his daily activities that he could not help his sister with many household chores beyond some cooking, dusting and cleaning laundry and that he had trouble concentrating enough to read a book or newspaper.  (Id. at 283, 287.)  He also testified that he was able to shop for food and clothing, manage his own money and bathe and dress himself.  (Id. at 287.)  Claimant testified that he does not socialize at all and spends much of his time during the day sleeping.  (Id. at 282.)  Claimant further testified that he does not garden or do yard work.  (Id. at 284.)

With regard to his knee injury, Mr. Norwood testified that he suffered the initial injury while on the job in 2003. (Id. at 274.) By the date of his hearing, Claimant testified that he still suffered from swelling, pain and weakness in the knee and that he wears a knee brace and occasionally uses a cane to get around. (Id. at 278-82.) Mr. Norwood testified that he experiences pain in the knee if he holds his knee in the same position for ten minutes or if he walks for more than five minutes. (Id. at 278-79.) He also indicated that he experiences pain if his knee is exposed to cold. (Id. at 279.) Claimant testified that his knee pain has disturbed his sleep on many occasions. (Id. at 277.)

According to Claimant's testimony about his irritable bowel syndrome ("IBS"), prior to 2003, he took medication in an effort to control the condition but the medication was not controlling it well. (Id. at 274.) Claimant testified that he had an occurrence of his IBS on average once a week and that he would have several other instances where he would experience cramping and abdominal pain. (Id. at 276-77.) He further testified that he had not attempted to wear an adult undergarment for his IBS. (Id. at 280.) He claimed that the occurrences were too powerful and he did not believe that such an item would do any good. (Id.) Claimant indicated that his IBS manifests itself often in sharp pains and cramping that would result in him voiding his

7

bowels and then feeling sick or weak for ten to fifteen minutes. (Id. at 284.)   Claimant testified that prior to his knee injury he was taking Donnatol to control his IBS.  (Id. at 275.)   While Claimant noted that the medication was not controlling his IBS entirely, he testified that he stopped taking the medication simply because he no longer could afford to buy the medication or travel to the doctor for prescription of medication.  (Id.)

Mr. Norwood also testified that he had developed an infection as a result of his knee injury and that this infection had affected his eyes.  (Id. at 275.)  Claimant indicated that, as a result of this infection, his eyes developed a sensitivity to bright lights and that he began to experience severe migraine headaches and nausea.  (Id.)  Claimant testified that antibiotics prescribed to wipe out the infection only made the sensitivity and headaches worse.  (Id.)

Regarding his depression, Claimant stated that his condition predated the time that he stopped working.  (Id. at 283.) Claimant testified that his depression would manifest itself in his sleeping patterns during the day and in his mood.  (Id. at 282.)  Claimant added that his depression kept him from concentrating on reading materials or from remembering simple things such as dates.  (Id. at 283.)  Claimant testified that he had received medical advice that his depression was aggravating his IBS and that he should treat the depression first.  (Id. at

282.)   At the time of his first hearing Claimant testified that he was being treated for his depression by Dr. David Friel.  (Id. at 281-82.)  Claimant testified that he was then taking Effexor XR for his depression.  (Id. at 277.)  He said that the drug was also meant to treat his IBS to a minimal degree.  (Id.)  At the time of his supplemental hearing on February 16, 2006, Claimant testified that he remained in the care of Dr. Friel, that he saw the doctor once every two or three months, and that the doctor believed that his depression was worsening.  (Id. at 299-301.)  At that time Claimant testified that Dr. Friel had begun prescribing Lexapro for his depression and that his visits to Dr. Friel included one-hour counseling sessions.  (Id. at 300-01.)

### 2.   Medical Evidence

#### a.   Claimant's Knee Impairment

On February 2, 2003, Mr. Norwood slipped and fell at his place of employment and developed pain and an abrasion on his left knee.  (Id. at 176-77.)  Claimant was first treated for this injury by Dr. W.G. Harris, who is listed as his primary care provider, on February 5, 2003.  (Id. at 177, 232-33.)  He was subsequently treated for the same injury at South Jersey Hospital's Emergency Room on February 8, 2003.  (Id. at 144-48.)  At that time, Claimant exhibited swelling and scabbing on the affected knee and complained of pain around the patella area of the knee.  (Id. at 144.)  Claimant was diagnosed as having a left

9

knee contusion and was released with a prescription for Naprosyn. (Id. at 145-46.)

Claimant continued his treatment at SJHS Occupational Health beginning on February 11, 2003.  (Id. at 149-79.)  At that time, Claimant was diagnosed with a left knee contusion, a lower leg contusion, a knee sprain and an abrasion to the left knee.  (Id. at 176.)  He was prohibited from assuming awkward positions, walking or standing for more than one hour, kneeling or squatting, and stair climbing.  (Id.)  The doctors at SJHS prescribed ibuprofen for Claimant's pain and requested that he treat the injury with heat.  (Id.)  Eight days later, Claimant was returned to regular work and was prescribed Tylenol or Advil as needed and told to apply a hot compress to the injury.  (Id. at 171-72.)  On February 26, 2003, in response to his further complaints of pain in the knee, Claimant was prescribed a course of physical therapy.  (Id. at 164-67.)  On March 12, 2003, Claimant was fitted for a knee brace and instructed to wear that brace as part of his treatment.  (Id. at 156-57.)  Finally, on April 1, 2003 Claimant was fully discharged from the care of SJHS Occupational Health and returned to full work duty.  (Id. at 149.)

Dr. Anthony Rosa examined Claimant at the request of the Social Security Administration on April 16, 2004 and determined that Claimant walked without any assistive device and that his

gait was normal.  (Id. at 212-13.)  Dr. Rosa's physical examination revealed no swelling or redness of the joints, and concluded that Claimant was able to squat and stand without problems.  (Id. at 213.)

Dr. Marshall Pressman examined Mr. Norwood at his attorney's request on May 10, 2005.  (Id. at 238-42.)  Dr. Pressman found a small scar and tenderness in Claimant's left lower leg.  (Id. at 240.)  He noted that Claimant's left knee exhibited crepitation[1] with tenderness resulting from compression of the knee as well as medial and lateral joint line tenderness[2] and varus stress tenderness.[3]  (Id. at 241.)  As a result of these findings, Dr. Pressman determined that Claimant now experiences a permanent orthopedic impairment of 32.5% of his left leg. (Id.)

   b.   Claimant's Irritable Bowel Syndrome

Claimant was first diagnosed with possible irritable bowel syndrome ("IBS") in February 2001 by Dr. Christopher Altamuro

---

[1] Crepitation is a "noise made by rubbing together the ends of a fractured bone."  Sloane-Dorland Annotated Medical-Legal Dictionary 172 (1987).

[2] The medial joint line travels across the joint in the direction of the median plane of the body.  1 Attorney's Medical Deskbook §11:5 (4th Ed. 2008).  The lateral joint line travels across the joint away from the direction of the median plane of the body (i.e. to the left or right).  Id.

[3] Varus stress tenderness is a tenderness caused by stressing the joint in a direction such that it is bent inward toward the midline of the body.  See Sloane-Dorland Annotated Medical-Legal Dictionary 766 (1987).

(Id. at 205.)   Dr. Altamuro scheduled him for a colonoscopy with Dr. Kirit Chhaya and prescribed Levbid.   (Id.)   Dr. Chhaya performed the colonoscopy on March 1, 2001 and determined that Claimant's internal hemorrhoids were "inflamed, irritated and friable."   (Id. at 181.)   The doctor prescribed Sitz baths, Anusol HC suppositories or cream and roughage or bulk producing laxative.   (Id.)

Dr. Altamuro noted six more instances where Claimant complained of IBS symptoms between February 2001 and September 2003.   (Id. at 187-90, 193, 202-04.)   On each occasion, the doctor urged Claimant to visit Dr. Chhaya for a re-evaulation and possible medication for his condition.   (Id.)   Dr. Altamuro also noted that he thought claimant suffered from anxiety disorder and depression.   (Id. at 202-03.)   The doctor believed that treatment of these other conditions with anti-depressant medications and psychiatric counseling might also result in an improvement of the IBS.   (Id.)   Notes from Dr. David Friel, a psychiatrist treating Claimant for his anxiety disorder and depression, indicate that Claimant complained of flare-ups of the IBS condition as late as June 23, 2005.   (Id. at 244.)

c.   Claimant's Depression/Anxiety Impairment

Dr. Altamuro diagnosed Claimant with anxiety disorder and depression in September of 2002.   (Id. at 204.)   The doctor offered to treat the depression at that time, but Claimant

12

decided to attempt to treat his IBS symptoms through visits to Dr. Chhaya first.  (Id. at 204.)  Twice more, in January and April of 2003, Dr. Altamuro offered to prescribe antidepressant medication to Claimant, but he refused the treatment.  (Id. at 202-03.)  Finally on June 5, 2003 Dr. Altamuro diagnosed Claimant with depression and prescribed Lexapro, an antidepressant, to help curb the symptoms.  (Id. at 192.)

Dr. Friel, Claimant's treating psychiatrist, began treating Claimant for depression in October of 2003, shortly before the end of his employment at Seabrook Brothers and almost two months before his application for disability was filed with the Social Security Administration.  (Id. at 247.)  At that time, Dr. Friel changed Claimant's prescription to the antidepressant Effexor XR. (Id. at 249.)  Dr. Friel diagnosed Claimant with depression and dysthymic disorder.[4]  (Id. at 244-46.)  Dr. Friel described Claimant in his notes as logical and goal-directed.  (Id. at 244-47.)  The doctor also registered a fluctuation in Claimant's depression, noting that Claimant was "improved" in April of 2004

---

[4] Dysthymia is defined as:

a mood disorder characterized by depressed feeling (sad, blue, low, down in the dumps) and loss of interest or pleasure in one's usual activities and in which the associated symptoms have persisted for more than two years but are not severe enough to meet the criteria for major depression.

Sloane-Dorland Annotated Medical-Legal Dictionary 204 (1992 Supp.).

and "stable" in May of the same year.  (Id. at 245.)  However,
Dr. Friel then indicated that Claimant was "not so good" during
his visit on October 21, 2004.  (Id. at 244.)  While Dr. Friel
does describe Claimant's lack of social interaction, he makes no
mention or diagnosis of any personality disorder.  (Id. at 245-
46.)  Although the record only shows notes from Dr. Friel
containing visits by Claimant until June 23, 2005, Claimant in
his testimony at the supplemental hearing indicated that he
continued to see Dr. Friel for depression long after his initial
hearing before the ALJ and that Dr. Friel changed Claimant's
prescription from Effexor XR back to Lexapro.  (Id. at 299.)

    Frederick Kurz, Ph.D., a psychologist, examined Claimant at
the request of the Social Security Administration on April 9,
2004.  (Id. at 208-10.)  Dr. Kurz found moderate levels of
depression and diagnosed Claimant with dysthymic disorder but
found nothing in his examination to "suggest the presence of any
thought or personality disorder."  (Id. at 210.)

    At the request of Claimant's attorney, Dr. Edward Tobe, a
psychiatrist, examined Claimant on December 17, 2005.  (Id. at
251-52.)  Dr. Tobe's evaluation was based both on an in-person
meeting with Claimant as well as a review of the records and
reports from Dr. Friel, Dr. Pressman, Dr. Altamuro and Dr.
Catherine Wisda.  (Id. at 251.)  Dr. Tobe notes that Claimant's
anxiety disorder stems from his knee injury and has caused a

"17.5% permanent of total psychiatric disability."  (Id. at 252.)
Dr. Tobe further notes in summary that Claimant has a preexisting
history of dysthymic disorder and schizoid personality disorder[5]
but makes no citation to any record for this history.  (Id.)  As
a result of these pre-existing conditions and Claimant's observed
frustration and anxiety with his knee injury, Dr. Tobe assessed
Claimant as having a 70% permanent total psychiatric disability.
(Id.)

     At the request of the Social Security Administration, Lewis
A. Lazarus, Ph.D. evaluated claimant on April 10, 2006, after the
supplemental ALJ hearing but before the decision was rendered.
(Id. at 253-57.)  Dr. Lazarus based his evaluation on an in-
person visit with Claimant as well as a review of the reports by
Dr. Kurz and Dr. Tobe.  (Id. at 253.)  Dr. Lazarus found that
Claimant's score of 87 on the Wechsler Adult Intelligence Scale-
III test fell well within the average range relative to
Claimant's age.  (Id. at 254.)  Dr. Lazarus diagnosed Claimant
with dysthymic disorder and IBS and indicated that "claimant
demonstrated the ability to follow and understand directions and

---

     [5] Schizoid is "a term applied by Bleuler to the shut-in,
unsocial, introspective type of personality."  Sloane-Dorland
Annotated Medical-Legal Dictionary 628 (1987).  A Personality
Disorder is defined as a "mental disorder composed of inflexible
and maladaptive personality traits that are self-perpetuating,
generate subjective distress, and result in significant
impairments in social functioning."  Sloane-Dorland Annotated
Medical-Legal Dictionary 404 (1992 Supp.).

intellectually he is functioning within the average range." (Id. at 255.)  Dr. Lazarus noted that Claimant might benefit from counseling and vocational assessment and rehabilitation.  (Id.)

Claimant also has exhibited headaches[6] and vision problems[7] in his medical history. However, neither condition is claimed as basis for disability by Claimant in this case; nor did the ALJ consider either condition significant enough to effect Claimant's Residual Functional Capacity.

### 4.   Vocational Evidence

#### a.   Mental Residual Functional Capacity Assessment

At the request of the Social Security Administration, Dr. Benito Tan completed a Psychiatric Review Technique checklist in order to help determine if Claimant suffered from a functional

---

[6] Claimant first reported headaches to Dr. Altamuro on March 27, 2003.  (R. at 196.) The doctor noted that Claimant's headaches concentrated in the frontal area and were aggravated by bright light.  (Id. at 197.)  He prescribed Fioricet to ease the effects of the headaches.  (Id. at 198.)  Dr. Altamuro noted further headaches on April 17, 2003 and again on April 29, 2003. (Id. at 202-03.)  But after that point there is no further mention of headaches in the Claimant's medical history.

[7] On March 31, 2003 Claimant complained to Dr. Altamuro of photophobia and visual disturbances.  (R. at 194.)  The doctor prescribed Zomig ZMT and referred Claimant to Dr. Catherine Wisda, an ophthalmologist.  (Id. at 195.)  Dr. Altamuro also restricted Claimant from driving or working machinery from March 25, 2003 until April 21, 2003.  (Id. at 206.)  Dr. Wisda diagnosed viral or allergic conjunctivitis and prescribed Maxitrol ophthalmic solution.  (Id.)  Other than the complaints associated with reports of headaches on April 17 and April 29, 2003, there is no further mention in Claimant's medical history of visual disturbances.

limitation as set forth in 20 C.F.R. § 404, Subpart P, Appendix 1. (<u>Id.</u> at 216-28.)  Dr. Tan noted that Claimant suffered from dysthymic disorder and that this disorder resulted in a mild to moderate limitation on the activities of daily living, a moderate limitation on maintaining social functioning and mild limitation on maintaining concentration, persistence or pace.  (<u>Id.</u> at 219, 226.)

Dr. Tan further completed a mental Residual Functional Capacity ("RFC") assessment of Claimant.  (<u>Id.</u> at 229-31.)  In that assessment Dr. Tan noted that Claimant suffered from Category 2, or moderate, limitations on the ability to keep a schedule and maintain regular attendance and punctuality.  (<u>Id.</u> at 229.)  Dr. Tan also determined that Claimant suffered from a moderate limitation on his ability to accept instructions and to interact with coworkers.  (<u>Id.</u> at 230.)  Additionally, Dr. Tan found that Claimant was moderately limited in his ability to respond to changes in the work setting and to travel in unfamiliar places.  (<u>Id.</u>)  Dr. Tan notes from his examination of Claimant that he "did not show evidence of clinical depression," that he "can understand and remember instructions" and that he could maintain concentration, persistence and pace and adapt to a work setting.  (<u>Id.</u> at 231.)

> b.   Claimant's Description of Demands of Past Relevant Work

Claimant completed a SSA Work History Report in which he described the duties and physical requirements of his three former positions at Seabrook Brothers.  (Id. at 94-101.)  While working as a laborer, Claimant reported that he was required to break up large sections of frozen vegetables with a pole and palletize cases of vegetables coming off of an assembly line. (Id. at 95.)  Claimant further reported that he walked and stood for eight hours a day, climbed for four hours a day and stooped and handled big objects for eight hours.  (Id.)  Claimant also reported that he was required in this job to lift and carry boxes weighing thirty-five pounds frequently,[8] and that the heaviest amount he was required to lift was fifty pounds.  (Id.)

While working as a line leader, Claimant reported that he was required to keep the assembly line clean and running and to relieve workers on the line when necessary.  (Id. at 97.) Claimant further reported that he walked and stood for eight hours a day, crouched for one hour a day and stooped and wrote, typed and handled small objects for eight hours.  (Id.)  Claimant also reported that in this job he was required to lift and carry boxes weighing twenty-five pounds frequently, and that the heaviest amount he was required to lift was fifty pounds.  (Id.) Finally, Claimant reported that he spent eight hours a day

---

[8]  "Frequently" for the purposes of the SSA form means from one-third to two-thirds of the workday.  (R. at 72.)

18

supervising five other employees in his job as line leader. (Id.)

While working in quality control, Mr. Norwood reported that he was required to grade the vegetables as they came through the line and to use scales to determine weights, documenting all of these variables. (Id. at 96.) Claimant further reported that he walked for eight hours a day, stood for two hours a day, sat for five hours a day and wrote, typed and handled small objects for eight hours. (Id.) Claimant also reported that in this job he was required to lift and carry items weighing ten pounds frequently, and that the heaviest amount he was required to lift was twenty pounds. (Id.)

c. Hearing Testimony by Vocational Expert

At the supplemental hearing before the ALJ on February 16, 2006, S. Mitchell Schmidt ("Mr. Schmidt"), a vocational expert, testified as to Claimant's past relevant work and the presence of any jobs in the national economy that fit Claimant's Residual Functional capacity ("RFC"). (Id. at 301-08.) Mr. Schmidt identified Claimant's past relevant work as being a quality control technician, a general laborer, and a line leader.[9] (Id.

---

[9] A "quality control technician" is defined in the Dictionary of Occupational Titles ("DOT") as "light work" that is "skilled" and requires a specific vocational preparation ("SVP") level of 7 (i.e. requiring more than two years and up to four years of preparation). Dictionary of Occupational Titles § 012.261-014 (4th Ed. 2001). The DOT defines the occupation of "general laborer" as "medium work" that is "unskilled" and

at 303.)  Mr. Schmidt was asked by the ALJ to assess the ability
of a hypothetical individual with Claimant's impairments to
perform any of those jobs.[10]  (Id. at 303-05.)  Mr. Schmidt
claimed that, given limitations similar to those described in
footnote 10 below, an individual would not be able to perform any
of those past relevant occupations.  (Id. at 304.)  Mr. Schmidt
further testified that given the same limitations an individual

_____

requires a SVP level of 2 (i.e. requiring a short demonstration
lasting up to and beyond one month).  Dictionary of Occupational
Titles § 754.687-010 (4th Ed. 2001).  The DOT does not contain a
definition for "line leader."  However, Mr. Schmidt indicated
that the equivalent DOT code was that of "utility worker, line
assembly."  (R. at 303.)  Such a position is defined in the DOT
as "medium work" that is "semi-skilled" and requires an SVP level
of 4 (i.e requiring more than three months up to and including
six months of preparation).  Dictionary of Occupational Titles §
806.367-010 (4th Ed. 2001).

[10]  The hypothetical set forth by the ALJ was of a person who
was "35 years of age and who has a high school education."  (R.
at 303.)  The hypothetical individual posed in question to Mr.
Schmidt by the ALJ also possessed the following exertional
limitations:

> [He] can sit for a total of six hours out of eight in
> the workday . . . can stand for up to 30 minutes at a
> time . . . for a total of four hours out of eight in
> the workday . . . can walk for up to 30 minutes at a
> time . . . for a total of two hours out of eight in the
> workday . . . lift 20 pounds on an occasional basis, 10
> pounds on a frequent basis; carry 20 pounds on an
> occasional basis, 10 pounds on a frequent basis.

(Id. at 303-04.)  The ALJ further postulated that the
individual's non-exertional limitations were such that he "can
only occasionally climb stairs, can never climb ladders, can only
occasionally bend or stoop."  (Id. at 304.)  The hypothetical
individual's non-exertional limitations also restricted him to
"simple, repetitive tasks requiring simple instructions."  (Id.
at 304.)

would be able to perform "a full range of light and sedentary
unskilled jobs." (Id. at 305.)

Basing his determinations on an area including Burlington,
Camden, Gloucester, and Salem Counties in New Jersey and using
data provided to him by the New Jersey Department of Labor, Mr.
Schmidt determined that an individual with the same limitations
as set forth above would be able to perform jobs that were
available in the local area and in the national economy. (Id. at
304-05.) As examples he noted that such an individual would be
able to work as a recreation aide,[11] a shipping and receiving
weigher,[12] and a garment sorter.[13] (Id.) However, Mr. Schmidt
did testify that an individual who, on top of the above

_____

[11] "Recreation Aide" is defined in the DOT as light,
unskilled work requiring an SVP level of 2. Dictionary of
Occupational Titles § 195.367-030 (4th Ed. 2001). According to
Mr. Schmidt, 200 such positions are available in one region,
2,400 such positions are available in several regions and 125,000
such positions are available in the national economy. (R. at
304.)

[12] "Shipping and Receiving Weigher" is defined in the DOT as
light, unskilled work requiring an SVP level of 2. Dictionary of
Occupational Titles § 222.387-074 (4th Ed. 2001). According to
Mr. Schmidt, 710 such positions are available in one region,
9,400 such positions are available in several regions and 490,000
such positions are available in the national economy. (R. at
305.)

[13] "Garment Sorter" is defined in the DOT as light,
unskilled work requiring an SVP level of 2. Dictionary of
Occupational Titles § 222.687-014 (4th Ed. 2001). According to
Mr. Schmidt, 2,300 such positions are available in one region,
27,500 such positions are available in several regions and
1,400,000 such positions are available in the national economy.
(R. at 305.)

determined limitations, manifested a complete inability to relate to supervisors and coworkers would be precluded from any work in the national economy.  (<u>Id.</u> at 305.)  He further indicated that an individual exhibiting an inability to accept instruction and accept criticism more than a third of the time would also be precluded from any work in the national economy.  (<u>Id.</u> at 308.)

    5.   ALJ's Findings

On June 23, 2006, ALJ Christopher K. Bullard issued a decision ruling that Claimant was not eligible for disability insurance benefits under Title II of the Social Security Act, as he was not disabled.  (<u>Id.</u> at 23-31.)  The ALJ further ruled that Claimant was not eligible for supplemental security income under Title XVI of the Social Security Act for the same reason.  (<u>Id.</u>)

                    a. Analysis by the ALJ of the Severity of
                    Claimant's Impairments

The ALJ noted that Claimant was not engaged in substantial gainful activity at any time relevant to the decision.  (<u>Id.</u> at 25.)  He found that although Claimant suffers from the impairments of chondromalacia[14] of the left knee, irritable bowel syndrome, headaches, depression and an anxiety disorder, these impairments did not meet or equal any of the impairments listed in Appendix 1, Subpart P, of the federal regulations as set forth

───────────

    [14] Chondromalacia indicates a softening of the cartilage in the knee joint.  <u>Sloane-Dorland Annotated Medical-Legal Dictionary</u> 140 (1987).

in 20 C.F.R. §§ 404.1520(d) and 416.920(d).  (Id. at 28.)  In reaching these conclusions the ALJ relied on the testimony of the Claimant as well as the medical reports of Dr. Altamuro, Dr. Chhaya, Dr. Rosa, Dr. Pressman, Dr. Kurz, Dr. Friel, Dr. Tobe and Dr. Lazarus.  (Id. at 25-28.)

The ALJ noted that Claimant alleged vision loss but the ALJ found that "no objective medical evidence" supported a conclusion that this vision loss could be considered a "severe" impairment. (Id. at 25.)  The ALJ also referenced the treatment notes from the South Jersey Hospital's Emergency Room and the SJHS Occupational Health center when making his determinations of the severity of Claimant's impairments.  (Id. at 26.)  Additionally, when discussing the opinion of Dr. Friel, the ALJ identified Dr. Friel as Claimant's "treating psychiatrist."  (Id. at 27.)

> b. Analysis by ALJ of Claimant's Residual
> Functional Capacity ("RFC")

The ALJ next determined that Claimant retained the Residual Functional Capacity ("RFC") to perform a range of light, unskilled occupations as defined in 20 C.F.R. §§ 404.1567(b) and 404.1568(a). In reaching this conclusion the ALJ found Claimant able to "lift and carry up to twenty pounds occasionally and ten pounds frequently."  (Id. at 28.)  He further found that Claimant could "sit for six hours (in one hour intervals), stand for four hours (in thirty minute intervals), and walk for two hours (in thirty minute intervals)" in an eight-hour work day.  (Id.)  The

23

ALJ also found that Claimant "can never climb ladders and can only occasionally climb stairs, bend, or stoop, and can understand, and remember simple instructions and carry[ ]out simple, repetitive tasks[.]" (Id.)  The ALJ further found that the "[C]laimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the [C]laimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible." (Id. at 29.)

In making his determinations, the ALJ considered the testimony of Claimant as well as the medical reports filed by Dr. Rosa, Dr. Pressman, Dr. Kurz and Dr. Lazarus as well as the notes and records of Dr. Friel. (Id. at 29.)  The ALJ disregarded the assessment of Dr. Tobe as not credible with regard to Claimant's psychiatric disability level due to the report's nature as a worker's compensation opinion and its diagnosis of schizoid personality disorder, a diagnosis not present in any other report. (Id.)

The ALJ considered Claimant's irritable bowel syndrome when determining the RFC but noted that Claimant takes no medication to control the condition and that he suffers from incontinence only once a week. (Id. at 29.)

With regard to Claimant's knee injury, the ALJ pointed to testimony by the Claimant as well as the medical report from Dr.

24

Rosa that indicated that Claimant could do minor household chores such as cooking, cleaning, shopping and bathing and dressing himself.  (Id.)  The ALJ also credited Claimant's testimony that he only takes "over the counter" pain medication for his knee. (Id.)  The ALJ further noted that the medical report from Dr. Rosa indicated no physical limitations for Claimant based on his knee injury.  (Id.)  The ALJ also cited the report of Dr. Pressman which indicated full strength in Claimant's lower extremities and no muscle atrophy as evidence that limitation to Claimant's activity based on his knee injury was not as severe as he claimed.  (Id.)

The ALJ found that, as evidenced by Dr. Friel's treatment records, Claimant suffered from depression and anxiety but that those conditions had somewhat improved for Claimant while he was under Dr. Friel's care.  (Id.)  The ALJ further noted that the report from Dr. Kurz found no evidence of depression or thought or personality disorders.  (Id.)  Taking into account the report of Dr. Lazarus, the ALJ determined that Claimant demonstrated average intelligence.  (Id.)  The ALJ discounted Dr. Tobe's assessment that Claimant suffered from a schizoid personality disorder and thus suffered a 70% psychiatric disability.  (Id.) The ALJ instead relied upon Dr. Tobe's base assessment of a moderate mental disability.  (Id.)

> c. Analysis by ALJ of Claimant's Vocational
> Profile and Availability of Employment

25

The ALJ further found that Claimant's past relevant work as a quality control technician, a general laborer, and a line leader were each outside of his current Residual Functional capacity. (Id. at 30.)  Specifically the ALJ found that Claimant's work as a quality control technician was light, skilled labor, his work as a general laborer was heavy, unskilled labor, and his work as a line leader was medium, semi-skilled labor as defined under the applicable federal regulations. (Id.)

The ALJ then examined Claimant's vocational profile and determined that, at the age of 33, he was a younger individual between the ages of 18 and 44 with at least a high school education and able to communicate in English. (Id. at 30, 67.) The ALJ further determined that Claimant's age made transferability of job skills immaterial to a determination of disability. (Id. at 30.)  Finally, the ALJ concluded that Claimant's medically determinable impairments did not prevent him from performing certain occupations such as "recreation aide", "shipping and receiving weigher", and "garment sorter", all of which exist in significant numbers in the national economy. (Id. at 31.)  Therefore, the ALJ determined that Claimant was not disabled as defined under the Social Security Act. (Id.)

## II.  DISCUSSION

### A.  Standard of Review

#### 1.  Standard for Judicial Review of Commissioner's Decision

26

Under Section 205 of the Social Security Act, Congress provided for judicial review of the Commissioner's decision to deny a claimant's application for disability insurance benefits and supplemental security income.  42 U.S.C. §§ 405(g), 1383(c)(3)(2000); see also Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).  However, a reviewing court must uphold the Commissioner's conclusions where they are supported by "substantial evidence."  42 U.S.C. § 405(g) (2000); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001).  Substantial evidence means "'more than a mere scintilla.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  It means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Id.  The inquiry is not whether the reviewing court would have made the same determination, but whether the Commissioner's conclusion was reasonable.  See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  Indeed, the "substantial evidence standard is deferential and includes deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence."  Shaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999).

Some types of evidence will not be "substantial." For example,

"[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or

27

> fails to resolve, a conflict created by countervailing
> evidence.   Nor  is  evidence  substantial  if  it  is
> overwhelmed by other evidence—particularly certain types
> of evidence (e.g. that offered by treating physicians)—or
> if  it  really  constitutes  not  evidence  but  mere
> conclusion."

Wallace v. Sec'y of Health and Human Servs., 722 F.2d 1150, 1153

(3d Cir. 1983) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d

Cir. 1983)).

A reviewing court does have the duty to review the evidence

in its totality.   See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir.

1984).   "[A] court must 'take into account whatever in the record

fairly detracts from [a particular piece of evidence's] weight.'"

Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997)

(quoting Willbanks v. Sec'y of Health & Human Servs., 847 F.2d

301, 303 (6th Cir. 1988) (quoting Universal Camera Corp. v. NLRB,

340 U.S. 474, 488 (1951))).   The Commissioner has a corresponding

duty to "adequately explain in the record [the] reasons for

rejecting or discrediting competent evidence," Ogden v. Bowen,

677 F. Supp 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler,

786 F.2d 581 (3d Cir. 1986)), including medical evidence and all

non-medical evidence presented.   Burnett v. Comm'r of Soc. Sec.

Admin., 220 F.3d 112, 122 (3d Cir. 2000).

The Third Circuit has held that access to the Commissioner's

reasoning is essential to a meaningful court review:

> "[U]nless the [Commissioner] has analyzed all evidence
> and has sufficiently explained the weight he has given to
> obviously probative exhibits, to say that his decision is

> supported by substantial evidence approaches an
> abdication of the court's 'duty to scrutinize the record
> as a whole to determine whether the conclusions reached
> are rational.'"

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting

Arnold v. Sec'y of Health, Educ. & Welfare, 567 F.2d 258, 259

(4th Cir. 1977)).  Nevertheless, a district court is not

"empowered to weigh the evidence or substitute its conclusions

for those of the fact-finder."  Williams v. Sullivan, 970 F.2d

1178, 1182 (3d Cir. 1992).

> 2.   Standard for Disability Insurance Benefits under
>      Title II and Supplemental Security Income under
>      Title XVI of the Social Security Act

The Social Security Act defines "disability" for purposes of

entitlement to both Disability Insurance Benefits and

Supplemental Insurance Income as the inability "to engage in any

substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last

for a continuous period of not less than twelve months."  42

U.S.C. §§ 423(d), 1382c(a)(3)(B).  Under this definition, "a

claimant qualifies as disabled only if [that claimant's] physical

or mental impairments are of such severity that [the claimant] is

not only unable to do his [or her] previous work, but cannot,

considering [the claimant's] age, education, and work experience,

engage in any other kind of substantial gainful work which exists

in the national economy. . ."  42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B). Impairments must be considered in combination when making disability determinations.  Burnam v. Schweiker, 682 F.2d 456, 458 (3d. Cir. 1982).

The Commissioner has promulgated regulations for determining disability applicable to Disability Insurance cases.  See 20 C.F.R. §§ 404.1501-404.1599.  Under these regulations, substantial gainful activity is defined as "work that - (a) involves doing significant and productive physical or mental duties; and (b) is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.  Importantly, this definition presupposes a regular, continuing, and sustained ability to perform such work.  Kangas v. Bowen, 823 F.2d 775, 778 (3d Cir. 1987).

The regulations promulgated by the Commissioner for determining disability in all social security benefits cases require application of a five-step sequential analysis.  20 C.F.R. § 404.1520.  This process is summarized as follows:

1.   If the claimant currently is engaged in substantial gainful employment, he will be found "not disabled."

2.   If the claimant does not suffer from a "severe impairment," he will be found "not disabled."

3.   If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled."

4.   If able to still perform work he has done in the past ("past relevant work") despite the severe impairment, he will be found "not disabled."

30

> 5.  Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education, and past work experience to determine whether or not the claimant is capable of performing other work which exists in the national economy.  If incapable, the claimant will be found "disabled."  If capable, the claimant will be found "not disabled."

20 C.F.R. § 404.1520(b)-(f).  Entitlement to benefits is therefore dependent upon a finding the claimant is incapable of performing other type of work in the national economy.

This five-step process involves a shifting burden of proof. Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983).  In the first four steps of the analysis, the burden is on the claimant to prove every element of his claim by a preponderance of the evidence.  Id.  In the final step, the Commissioner bears the burden of proving that work is available for the claimant: "Once a claimant has proved that he is unable to perform his former job, the burden shifts to the [Commissioner] to prove that there is some other kind of substantial gainful employment he is able to perform."  Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987) (citing Chicager v. Califano, 574 F.2d 161 (3d Cir. 1978)).

**B.  Analysis**

   1.  Whether the ALJ Properly Weighed the Medical Evidence of the Record

The Claimant argues that the decision of the ALJ should be reversed because, when determining the severity of Claimant's

impairments at step three of his analysis, the ALJ (i) did not
properly explain the weight given to the reports of Dr. Friel,
Dr. Kurz and Dr. Lazarus as required under Social Security
Rulings ("SSR") 96-2p and 96-6p; (ii) improperly dismissed Dr.
Tobe's diagnosis of Claimant as having schizoid personality
disorder; and (iii) failed to account for the report of Dr.
Benito Tan.  (Pl.'s Mem. of Law at 14-15.)  This Court disagrees
with that assessment and determines that the ALJ did, in fact,
take proper account of the various medical reports in the record
when determining the seriousness of Claimant's impairments.

The Third Circuit has long held that "[a] court considering
a claim for disability benefits must give greater weight to the
findings of a treating physician."  Mason v. Shalala, 994 F.2d
1058, 1067 (3d Cir. 1993).  See Kane v. Heckler, 776 F.2d 1130,
1135 (3d Cir. 1985).  This is particularly true "'when the
opinion reflects an expert judgment based on a continuing
observation of the patient's condition over a prolonged period of
time.'"  Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987)
(quoting Podedworny v. Harris, 745 F.2d 210, 217 (3d Cir. 1984)).
Therefore the opinion of the treating physician is entitled to
more weight than that of a one-time consultative examiner,
Adorno v. Shalala, 40 F.3d 43, 47 (3d Cir. 1994), or that of a
medical advisor or other non-examining physician, Dorf v. Bowen,
794 F.2d 896 (3d Cir. 1986).

Additionally, while consideration of evidence in the report of a physician consulted for the worker's compensation purposes is not prohibited in the realm of Social Security benefits, the use of such reports for Social Security purposes has been criticized in this district.  See Minitee v. Harris, 510 F. Supp. 1216, 1218-19 (D.N.J. 1980).  However, the Third Circuit has determined that these reports are entitled to some weight.  Coria v. Heckler, 750 F.2d 245, 248 (3d Cir. 1984); Wallace v. Sec'y of Health and Human Servs., 722 F.2d 1150 (3d Cir. 1983).  These types of reports should be weighed against the other evidence of record, and the ALJ may reasonably disregard so much of the physicians' reports as set forth their conclusions as to the claimant's disability for worker's compensation purposes while crediting the objective medical findings therein.  Coria, 750 F.2d at 247.

In this case, there is substantial evidence that the ALJ did give controlling weight to the records provided by Dr. Friel, Claimant's treating physician, as required by SSR 96-2p.  In fact, the ALJ's dismissal of Dr. Tobe's diagnosis of schizoid personality disorder was based in part on the fact that Dr. Friel had never reached the same diagnosis.  (R. at 29-30.)  The ALJ noted that Dr. Friel diagnosed Claimant with a depressive disorder and prescribed an antidepressant for this condition. (Id. at 27.)  The ALJ also found that Dr. Friel's notes indicated

33

an improvement of Claimant's condition through the medication and treatment.  (Id.)  Nowhere in the decision does the ALJ indicate any disagreement with Dr. Friel's findings or diagnoses.

The ALJ further detailed the reports of Dr. Kurz and Dr. Lazarus which note that Claimant suffers from dysthymic disorder and that he exhibits average intelligence and moderate limitations on his ability to understand instructions and to interact in a working environment.  (Id. at 26, 28.)  The ALJ did not note any disagreement with either doctor and indicated that he "assigns some weight" to the report provided by Dr. Lazarus. (Id. at 28.)  The diagnoses presented by Dr. Kurz and Dr. Lazarus do not appear to differ from those present on the treatment records provided by Dr. Friel.

As for the report of Dr. Tobe, the ALJ refused to give any weight to the determination that Claimant suffers from a 70% psychiatric disability.  (Id. at 29.)  In making this decision, the ALJ noted that Dr. Tobe was consulted for the purposes of worker's compensation and that his diagnosis contained a "history of schizoid personality disorder" that no other physician, including Claimant's treating physician, had diagnosed.  (Id. at 29-30.)  The ALJ was thus properly wary of the different standards of determining disability under worker's compensation[15]

_____

[15] Social Security disability insurance is available only where the disability could be expected to lead to death or last for more than 12 months, and prevents the ability to engage in

34

and those under the Social Security Act and he proceeded to compare Dr. Tobe's determinations with the other medical evidence presented, particularly the records of Claimant's treating physician.  (Id.)  The ALJ therefore properly gave the treating physician's records controlling weight in discrediting Dr. Tobe's diagnosis of personality disorder.  (Id. at 29.)  The ALJ then properly admitted the rest of Dr. Tobe's report as evidence that Claimant suffered from a moderate mental impairment similar to that found by Dr. Kurz and Dr. Lazarus.  (Id. at 30.)

Claimant also argues that the ALJ did not take into account the findings of Dr. Benito Tan when determining the seriousness of Claimant's limitations.  (Pl.'s Mem. of Law at 15).  However, Claimant admits that the report by Dr. Tan indicates that Claimant did not suffer from limitations that were "of [l]isting severity at [s]tep [three] of the [analysis]."  (Id.)  Therefore this section of Dr. Tan's report actually provides further evidence of the lack of seriousness of the Claimant's limitations as found by the ALJ at step three of his analysis.[16]  The

_____

any substantial gainful activity.  42 U.S.C. § 423(d)(1)(A).  In contrast, under worker's compensation, even temporary and partial disability are compensated.  See e.g. N.J. Stat. Ann. § 34:15-12 (West 2000)  Furthermore, Social Security disability conclusions are not geared to a percentage of disability, as are worker's compensation disability conclusions.  Id.

[16] Dr. Tan's Psychiatric Review Technique report was specifically geared toward determining the seriousness of Claimant's impairment for comparison against those impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 216-

remainder of Dr. Tan's report involves a Mental Residual Functional Capacity report and is more properly examined in reviewing the ALJ's determination of Claimant's Residual Functional Capacity, which is addressed below.  See infra Part II.B.2.

As noted above, the reports of at least two consultative examiners and the treatment records from the Claimant's treating physician amount to substantial evidence to support the determinations by the ALJ in step two of the analysis that the Claimant suffered from severe impairments.  The same reports support the step three determinations that Claimant's impairments did not match any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

2. Whether the ALJ Properly Determined Claimant's Residual Functional Capacity

Claimant further argues that the ALJ did not properly assess Claimant's Residual Functional Capacity ("RFC") on a function-by-function basis as required by SSR 96-8p before determining that the Claimant could not do any past relevant work as required by step four of the analysis.  (Pl.'s Mem. of Law at 20).  Claimant also argues that the ALJ was in error in finding that Claimant's RFC permitted him to work in the national economy as required by

---

29.)  The Report details impairments below the level required for "functional limitation" and thus not within the level of any listed impairment in Appendix 1.  (Id. at 226.)

step five of the analysis.  (Id.)  The Court also disagrees with these contentions and finds that substantial evidence exists in the record that supports the ALJ's assessment of Claimant's RFC and the application thereof to the availability of jobs in the national economy.

An ALJ's findings pertaining to a Claimant's residual functional capacity must be supported by the medical evidence. Doak v. Heckler, 790 F.2d 26, 29 (3d Cir. 1986).  A residual functional capacity evaluation form without a thorough written medical report is not substantial evidence.  Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993).

A vocational expert may be used when "the issue in determining whether you are disabled is whether your work skills can be used in other work and the specific occupations in which they can be used."  20 C.F.R. § 404.1566(3).  See also Santise v. Schweiker, 676 F.2d 925 (3d Cir. 1982); Singleton v. Schweiker, 551 F. Supp. 715, 723 (E.D. Pa. 1982).

The Social Security Administration ("SSA") has issued a policy interpretation ruling about how an ALJ should go about determining the RFC of a particular claimant.  SSR 96-8p (1996). In that interpretation, the SSA requires an ALJ to set forth on a "function-by-function basis" the exertional and non-exertional limitations that a particular claimant faced.  Id.  The SSA further urges ALJs to "include a narrative discussion describing

37

how the evidence supports each conclusion" and to "always consider and address medical source opinions." Id. The SSA further warns against use of a "Psychiatric Review Technique Form" when determining RFC. Id. In its ruling the SSA warned that such a form is used primarily to assess the Claimant's limitations in relation to the "categories identified in the 'paragraph B' and 'paragraph C' criteria of the adult mental disorders listings [in 20 C.F.R. Part 404, Subpart P, Appendix 1]." Id. The SSA specifically noted that

> the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps [two] and [three] of the sequential evaluation process. The mental RFC assessment used at steps [four] and [five] of the sequential evaluation process requires a more detailed assessment.

Id.

In this case, the Claimant argues that the ALJ did not set forth a function-by-function analysis of the Claimant's RFC. However, the ALJ did indeed set forth such an analysis of the Claimant's residual function capacity in finding number five of his decision. (R. at 28.) In that finding the ALJ detailed the Claimant's RFC as follows:

> [C]laimant has the Residual Functional capacity to lift and carry up to twenty pounds occasionally and ten pounds frequently, sit for six hours (in one hour intervals), stand for four hours (in thirty minute intervals) and walk for two hours (in thirty minute intervals) but can never climb ladders, can only occasionally climb stairs, bend or stoop, and can only understand, and remember

38

> simple instructions and carry[]out simple, repetitive
> tasks.

(Id.)  This is precisely the "function-by-function" elucidation
of the RFC required by the Social Security Administration in SSR
96-8p.

In finding this RFC, the ALJ laid out a narrative detailing
the sources of the limitations found and leaning heavily on the
medical evidence provided in the record.  (Id. at 28-30.)

a.  Determining Claimant's Physical RFC

The section of Claimant's RFC that relates to physical
activity, both exertional (i.e. ability to lift and carry weight,
ability to sit, walk and stand) and non-exertional (i.e. ability
to stoop, bend or climb), fits exactly into the category of
"light work" capacity as defined by the applicable federal
regulations.  20 C.F.R. § 404.1567(b) and 416.967(b).  This is
the second-least strenuous physical activity category allowed by
the regulations.[17]  However, the ALJ does not use the word
"light" to describe Claimant's physical RFC at any time except
when discussing the testimony of the vocational expert and the
applicability of the Medical-Vocational Guidelines.  (R. at 28-

---

[17] The only less strenuous category of work is "sedentary"
which requires only the ability to lift ten pounds and involves
sitting and only occasional standing or walking.  20 C.F.R. §
404.1567(a) and 416.967(a).  The more strenuous categories are
"medium work", "heavy work", and "very heavy work".  20 C.F.R. §
404.1567(c)-(e) and 416.967(c)-(e)

31.)  The ALJ arrived at the determination of Claimant's physical RFC from examining the effect of Claimant's irritable bowel syndrome and his previous knee injury on his ability to perform the selected physical activities. (Id. at 29.)

Specifically, the ALJ noted that Claimant's irritable bowel syndrome could pose a problem to participating in physical activity.  (Id.)  The ALJ, however, noted that Claimant himself testified that he takes no medication for the condition and only suffers from the condition on average about once a week.  (Id.)

The ALJ also recognized that Claimant's knee injury might be limiting to his physical RFC.  (Id.)  However, the ALJ cited the report from Dr. Rosa which stated that Claimant could "cook, clean, do the laundry, shop for food, and clothing, and bathe and dress himself."  (Id.)  The ALJ further cited the reports of Dr. Pressman who found full muscle strength and no muscle atrophy in Claimant's lower extremities and the records of SJHS Occupational Health indicating that Claimant was able to return to full work duty with no limitations on April 1, 2003.  (Id.)  The ALJ further noted that Claimant only takes an over-the counter medication for pain related to his knee injury.  (Id.)

Comparing the ALJ's findings to the reports of the doctors cited, the Court easily finds that the ALJ properly considered the available medical opinions when determining the physical RFC. As noted above the examination by Dr. Pressman found some

40

limitation to Claimant's ability to work.  (Id. at 241.)
However, the doctor did not mention that any physical limitations
were such that Claimant could no longer work at all.  (Id.)
Additionally, Dr. Rosa in his report indicated that he could find
"no physical limitations that could be documented during physical
examination."  (Id. at 214.)

        Examining this evidence along the treatment notes from the
SJHS Occupational Health Center that returned the Claimant to
full duty on April 1, 2003, (id. at 149), it would appear that
there is evidence in the record to suggest that Claimant's
physical RFC is not even as limited as the ALJ set forth in his
decision.  However, as the ALJ gave sufficient weight to the
report by Dr. Pressman when determining that Claimant suffered
from some limitation to his physical activity and giving the
proper deference to such determinations of fact by the ALJ, this
Court finds that substantial evidence exists in the record to
support the Claimant's physical RFC as laid out by the ALJ in his
decision.

                b.  Determining Claimant's Mental RFC
        The section of Claimant's RFC which relates to mental
activity (i.e. ability to understand, remember and perform tasks
of varying complexity) fits exactly into the category of
"unskilled" capacity as defined by the applicable federal
regulations.  20 C.F.R. § 404.1568(a) and 416.968(a).  This is

                                    41

the least strenuous mental activity category allowed by the
regulations.[18]   However, the ALJ does not use the word
"unskilled" to describe Claimant's physical RFC at any time
except when discussing the testimony of the vocational expert and
the applicability of the Medical-Vocational Guidelines.  (R. at
28-31.) The ALJ arrived at the determination of Claimant's mental
RFC from a review of the medical evidence relating to the
Claimant's depression and anxiety.  (Id. at 29-30.)  In that
effort, the ALJ cites reports from Dr. Friel, Dr. Kurz and Dr.
Lazarus in determining that Claimant can "only understand, and
remember simple instructions and carryout simple, repetitive
tasks."  (Id. at 28-30.)

Specifically, the ALJ relied on the treatment notes from Dr.
Friel, Claimant's treating physician to determine that Claimant
had improved in his mood through use of medication.  (Id. at 29.)
The ALJ further noted the examination of Claimant by Dr. Kurz
indicated that Claimant showed no evidence of any thought or
personality disorder.  (Id.)  The ALJ also cited the examination
of Claimant by Dr. Lazarus for the fact that Claimant scored
within the average range of the Wechsler Adult Intelligence Scale
III.  (Id.)

---

[18] The more strenuous categories are "semi-skilled",
"skilled".  20 C.F.R. § 404.1568(b)-(c) and 416.968(b)-(c)

Comparing these findings to the medical reports in the record, it is clear that the medical reports support the determination made by the ALJ in this case.  For example, Dr. Kurz stated that he believed Claimant to be of average intelligence and able to handle his finances.  (Id. at 211.) Additionally, Dr. Lazarus noted that Claimant's mental limitations did not prevent him from understanding directions and intellectually functioning within the average range.  (Id. at 255.) Dr. Friel's treatment notes also indicate that Claimant improved while taking Effexor for his depression, indicating at times that Claimant was "okay" and that his "mood [was] better." (Id. at 245-46.)

The ALJ rightfully did not mention the Psychiatric Review Technique of Dr. Tan when determining Claimant's mental RFC.  As noted above, this report specifically is relevant to step three of the analysis, not steps four and five when the RFC is to be determined.  SSR 96-8p.  As for Dr. Tan's Mental Residual Functional Capacity report, the ALJ also properly did not mention it in reviewing the Claimant's RFC as his evaluation was the type of form evaluation without an accompanying written report that the Third Circuit criticized as unreliable in Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993).

Even if the ALJ were to take account of Dr. Tan's report as Claimant now urges him to do, the brief note at the end of the

43

report specifically states that "[Claimant] can understand and remember instructions, can maintain [concentration, persistence, and pace] and adapt to work setting." (R. at 231.) All of these reports dovetail precisely with the findings of the ALJ in regard to Claimant's mental RFC and provide substantial evidence to support his findings.

c. Application of Claimant's RFC.

When making the final determination under step four of the sequential analysis, the ALJ took into account the RFC thus arrived at through examination of the medical records and applied it to the past relevant work that Claimant performed. (Id. at 30.) In doing this, he depended on the testimony of the vocational expert elicited at the supplemental hearing in regard to Claimant's past relevant occupations. (Id.) According to the testimony, the vocational expert related that he believed that none of Claimant's past relevant work experience fit within Claimant's particular RFC. (Id. at 304.) This method of determining the ability of Claimant to do any past relevant work is the appropriate one as set forth by the applicable federal regulation. 20 C.F.R. § 404.1566(3).

Applying the RFC to step five of the analysis, the ALJ determined that Claimant could perform jobs that existed in large quantity in both the local and national economy. (R. at 30-31.) In arriving at this conclusion, the ALJ noted that Claimant's RFC

44

limited him to performing only some types of light work as
defined in the federal regulations.  (Id. at 31.)  The ALJ relied
upon the testimony of the vocational expert when attempting to
determine if the Claimant's specific RFC allowed him to work in a
job present in sufficient numbers in the national economy.  (Id.
at 31.)  Here the vocational expert testified to three example
occupations that exist in large quantity in both the national and
local economy that would fit Claimant's RFC specifically.  (Id.
at 304-05.)  The ALJ cited those three occupations (recreation
aide, shipping and receiving weigher, and garment sorter) when
finding that Claimant could work at an occupation that existed in
sufficient numbers in the national economy.

It is true that the vocational expert testified that a
person of Claimant's age, education, work experience and physical
Residual Functional capacity could perform no work in the
national economy if that hypothetical individual had moderate
difficulty relating to his co-workers and supervisors.  (Id. at
308.)  However, that answer was elicited by a question from
Claimant's attorney defining moderate as "more than a third of
the time," a definition that does not exist anywhere in the
regulations and that does not relate to any statement of
Claimant's limitations by any of the doctors whose reports
comprise the record.  (Id.)  As such the ALJ was within his

45

discretion to ignore the question of such a limitation that was not supported by medical evidence provided in the record.

Therefore, this Court finds that there is substantial evidence in the record that the ALJ properly used the available medical evidence and the available testimony by a vocational expert to both determine Claimant's RFC and to apply that determination to the sequential analysis as required by 20 C.F.R. § 404.1520.  Particularly, substantial evidence exists in the record that supports the ALJ's determination at step four that the Claimant's RFC prohibited him from performing any past relevant work as well as the step five determination that Claimant is not prevented from performing jobs that exist in the national economy.

## III. CONCLUSION

For the reasons stated above, this Court finds that substantial evidence exists in the record to support the final decision of the Commissioner finding the Claimant to be not disabled as defined under the Social Security Act for purposes of eligibility for either Disability Insurance Benefits or Supplemental Security Income.  The accompanying Order to affirm is entered.


**November 3, 2008**                     **s/ Jerome B. Simandle**
DATE                                     JEROME B. SIMANDLE
                                         United States District Judge